IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| WILLIAM A. TACCINO, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | CIVIL NO. JKB-21-0840 |
| ACT 1ST FEDERAL CREDIT UNION, | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

In this suit, Plaintiffs William and Carol Taccino allege that Defendant Act 1st Federal Credit Union, their lending institution, violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*; the Expedited Funds Availability Act ("EFAA"), 12 U.S.C. § 4001 *et seq.*; and the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* (*See* Compl., ECF No. 3.) Plaintiffs also bring claims of predatory lending, breach of contract, fraud, and injury of credit under state law. (*Id.*) On April 2, 2021, Defendant removed this case to federal court and moved to dismiss all of Plaintiffs' claims. (ECF Nos. 1, 2.) Two months later, Plaintiffs filed a Motion to Continue the proceedings pending their receipt of certain information from government agencies (*see* ECF No. 13), which this Court has construed as a motion for a stay and denied (*see* ECF No. 15). Defendant's motion is fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Defendant's motion (ECF No. 2) will be granted in part with respect to Plaintiffs' federal law claims and denied in part with respect to Plaintiffs' state law claims. Because this Court declines to assert supplemental jurisdiction over Plaintiffs' remaining state law claims, those claims will be remanded to the Circuit Court for Allegany County.

## I.     *Background*[1]

Beginning on November 21, 2018, soon after Plaintiffs became members of Defendant Act 1st Federal Credit Union, and thereafter, Plaintiffs applied for loans from Defendant, which initially issued loans to Plaintiffs, but then began denying Plaintiffs' loan applications. Between November 21, 2018 and February 28, 2019, Plaintiffs received several loans from Defendant at values ranging from $2,500 to $10,000. (Compl. ¶¶ 1–3.) Plaintiffs allege that the interest rates on these loans increased from 7.74% to 11.39%, but when they asked Defendant why this increase occurred, Defendant did not answer. (*Id.* ¶ 3.) Defendant allegedly offered Plaintiffs a 0.25% lower interest rate if Plaintiffs elected to make their repayments electronically (*id.* ¶ 3), but Plaintiffs do not appear to have taken Defendant up on that offer.

Around March 2019, Plaintiffs applied for a $8,300 loan, which was denied "because of value or type of collateral not sufficient." (*Id.* ¶ 4.) Plaintiffs received another loan from Defendant on April 2, 2019, with a value of $19,470 and a "high interest" rate of 11.49%. (*Id.* ¶ 5.) However, Plaintiffs allege that they were denied two loans valued at around $10,000 to $20,000 in late April, which prevented them from purchasing a "rare car" with a "high book value of over $140,000.00." (*Id.* ¶ 6.) On June 17, 2019, Plaintiffs allegedly received a personal loan "to purchase computer equipment in the amount of $2500.00 with an interest rate of 11.640%," but Defendant allegedly placed a hold on the $2,500 until Plaintiffs went to Walmart, called Defendant from the checkout counter, and asked Defendant to release the funds. (*Id.* ¶ 7.) Mr. Taccino allegedly refused to take that action "and demanded the funds be released to them immediately," and the "funds were released a few days later." (*Id.* ¶ 7.)

---

[1] The facts in this section are taken from the Complaint and construed in the light most favorable to Plaintiffs. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). Plaintiffs attach multiple exhibits to the Complaint—and both parties attach exhibits to their briefing regarding dismissal—but the Court will not consider this evidence at the motion to dismiss stage. *See infra* Part II.

Following this incident, Plaintiffs sought several additional loans from Defendant, most of which were denied. (*Id.* ¶¶ 8–13.) Defendant allegedly denied these loan applications because Plaintiffs lacked "an appraisal from a credit union-approved appraiser," sought loans "exceed[ing] 'personal loan eligibility,'" and sustained a "number of recent inquiries on [their] credit report." (*Id.* ¶¶ 8–9, 12–13.) Around this time, Plaintiffs paid fees of $15 to $35 to Defendant "to skip loan payments" on several of their loans. (*Id.* ¶¶ 10, 14.) Plaintiffs allege that on November 25, 2019, they received a delinquency notice from Defendant and called Defendant to say that "Plaintiffs had never had a late loan payment in their history with Act 1st FCU." (*Id.* ¶ 15.) Plaintiffs allege that "Defendant told Plaintiffs they would take care of the problem immediately." (*Id.*)

On December 9, 2019, Plaintiffs allege that Mr. Taccino deposited $6,050 into his account with Defendant, but was given only $200 and told the remaining $5,850 would be on hold—and unavailable to Plaintiffs—for fourteen days. (*Id.* ¶ 16.) Mr. Taccino allegedly "demanded" that those funds be released, "but Defendant continued to withhold the funds" until December 14, 2019. (*Id.*) Plaintiffs allege that their inability to access those funds "caused [them] more financial hardship at other financial institutions." (*Id.*)

In August 2019, Plaintiffs paid a $35 fee to skip payments on two outstanding loans, but realized that fee "was not credited to the interest or principle [sic]" of those loans. (*Id.* ¶ 18.) Mr. Taccino allegedly asked Defendant "how this was reported to the credit reporting agency," but "he was not given an answer." (*Id.*) Nonetheless, Plaintiffs later paid $15 to continue skipping their payments on those loans.

Several months later, Plaintiffs notified Defendant that they "were unable to make payments" on several outstanding loans due to "the pandemic state of emergency," which required them to "purchas[e] extra food, medicine and supplies." (*Id.* ¶ 19.) Beginning on February 25,

3

2020, Defendant began sending Plaintiffs delinquency notices and "friendly reminders" that their loans were overdue. (*Id.* ¶¶ 20–22.) In April 2020, and again in October 2020, Plaintiffs refused Defendant's offers to make a $15 "skip payment," in part because Plaintiffs allege that their loans would have remained delinquent regardless of whether they made this "skip payment." (*Id.* ¶¶ 23, 46.) On March 16, 2020, Plaintiffs allegedly sent Defendant a "notice to cease and desist harassing Plaintiffs since Plaintiffs considered the option of filing bankruptcy, but could not do so because the courts were closed." (*Id.* ¶ 27.) Despite that communication, Defendant allegedly kept sending Plaintiffs delinquency notices regarding their outstanding loans. (*Id.* ¶¶ 25–45.)

Plaintiffs allege that Defendant violated multiple federal and state laws by lending at "predatory" interest rates, offering a 0.25% lower interest rate if Plaintiffs made their payments electronically, "wrongfully denying" Plaintiffs' loan applications, and "illegally with[holding] use of funds in Plaintiffs' account for several days[.]" (*Id.* ¶¶ 50–57.) Plaintiffs also argue that Defendant's policy of allowing Plaintiffs to pay to "skip payments," yet reporting these skipped payments "to credit reporting agencies as negative credit," was unlawful. (*Id.* ¶ 58.) Plaintiffs seek compensatory damages pursuant to nineteen claims, as well as $10,000 in punitive damages on each count. (*Id.* at 16–18.)

## *II.   Legal Standard*

"In considering a motion to dismiss" pursuant to Rule 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads

4

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).

According to Federal Rule of Civil Procedure 12(d), "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). In that event, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.*

### III. *Analysis*

Construing Plaintiffs' *pro se* Complaint liberally, this Court considers all of the federal claims that they appear to bring in this suit. *See White v. White*, 886 F.2d 721, 722–23 (4th Cir. 1989) ("[A court] must . . . hold the pro se complaint to less stringent standards than pleadings drafted by attorneys and must read the complaint liberally."). Even liberally construed, however, none of Plaintiffs' federal claims plausibly states a claim upon which relief can be granted.

### A. *Truth in Lending Act – Counts V, VI, VII, XII, XIII, XIV, and XV*

The TILA "requires lenders 'clearly and conspicuously' to make a number of disclosures to borrowers, including the disclosure of the borrowers' right to rescind a consumer credit transaction." *Watkins v. SunTrust Mortg., Inc.*, 663 F.3d 232, 234 (4th Cir. 2011) (quoting 15 U.S.C. § 1635(a)). A TILA suit must be brought "within one year from the date of the occurrence of the violation[.]" 15 U.S.C. § 1640(e). However, this Court has held that "plaintiffs' TILA claims are only subject to dismissal on this ground 'if the time bar is apparent on the face of the complaint.'" *Strickland-Lucas v. Citibank, N.A.*, 256 F. Supp. 3d 616, 626 (D. Md. 2017) (quoting *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005)).

5

Further, because this one-year statute of limitations is not a jurisdictional requirement, it may be equitably tolled under the doctrine of fraudulent concealment. *Id.* at 627. To demonstrate that fraudulent concealment warrants equitable tolling, a plaintiff must show "(i) that the party asserting the statute of limitations concealed facts that are the basis of the plaintiff's claim; (ii) that the plaintiff failed to discover those facts within the statutory period; and (iii) that the plaintiff failed to do so despite the exercise of due diligence." *Id.* (internal citations and quotation marks omitted).

Defendant argues that Plaintiffs' claims are time-barred under the TILA's statute of limitations. (Mot. Dismiss Mem. Supp. at 7, ECF No. 2-1.) Based on the face of Plaintiffs' Complaint, which ascribes specific dates to the actions underlying their seven TILA counts, this Court agrees. In Counts V, VI, VII, XII, XIII, XIV, and XV, Plaintiffs allege that Defendant violated the TILA by improperly increasing Plaintiffs' interest rates by 0.25%. (*See* Compl. ¶¶ 86–88, 93–96.) Notably, these counts are premised on the alleged TILA violations that occurred from January through November of 2019 (*see id.*), and the Complaint was filed on February 2, 2021, over one year later (*see* Compl.). Moreover, Plaintiffs have made no showing of the elements of fraudulent concealment; on the contrary, Plaintiffs appear to have learned that Defendant was charging a 0.25% higher interest rate at the same time that the parties agreed to the terms of each loan.

Plaintiffs argue that the one-year statute of limitations period for their TILA claims should be tolled because "the tolling of the clock does not run during the time the courts were closed to the public during the pandemic and were only hearing emergency cases, not cases like this one." (Opp'n Mot. Dismiss at 2, ECF No. 9.) However, Defendant correctly responds that this Court's recent Standing Orders explicitly state that the COVID-19 pandemic does not toll any statutes of

6

limitation because litigants may still submit filings electronically or deliver them in person to the courthouse. (Reply at 2, ECF No. 12.; *see also In re Standing Orders*, Misc. No. 00-0308 at ECF Nos. 97, 99, 103.) Accordingly, the Court will not toll the statute of limitations period for Plaintiffs' TILA claims as a result of the COVID-19 pandemic.

Because Plaintiffs' TILA claims do not fall within the one-year period for bringing a TILA suit on the face of the Complaint, and Plaintiffs proffer no reason for equitably tolling this limitations period, the Court will dismiss the TILA claims in Counts V, VI, VII, XII, XIII, XIV, and XV of the Complaint.

### B. *Expedited Funds Availability Act – Count XVIII*

The EFAA, which was "[e]nacted to provide faster availability of deposited funds," sets forth "specific time periods in which depository banks must make deposits available for withdrawal, and makes banks civilly liable to individuals for damages incurred because of an EFAA violation." *Nix v. NASA Fed. Credit Union*, 200 F. Supp. 3d 578, 586 (D. Md. 2016). As with the TILA, the EFAA establishes a one-year statute of limitations for bringing claims under the statute. *See* 12 U.S.C. § 4010(d) (emphasis added) ("Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, *within one year* after the date of the occurrence of the violation involved.").

Defendant asserts that Plaintiffs' claim under the EFAA is time-barred. (Mot. Dismiss Mem. Supp. at 14–15.) In Count XVIII of the Complaint, Plaintiffs argue that Defendant violated the EFAA by withholding $5,850 out of $6,050 that was deposited in Plaintiffs' account for a five-day period, "despite Plaintiffs' attempts to have the funds released pursuant to the [E]FAA." (Compl. ¶¶ 67, 99.) Because this alleged EFAA violation occurred on December 9, 2019 (*see id.* ¶ 67), more than a year prior to the filing of this Complaint on February 2, 2021, and because the

Court again rejects Plaintiffs' argument that the pandemic tolled statutes of limitation for the reasons explained above, *see supra* Part III.A, the Court will likewise dismiss Count XVIII of the Complaint.

### *C. Fair Credit Reporting Act – Counts XVI and XVII*

"Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007); *see also Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1328, 1333 (9th Cir. 1995) (internal citations omitted) (explaining the FCRA "was crafted to protect consumers from the transmission of inaccurate information about them . . . and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner").

Plaintiffs do not specify the FCRA provision under which they are suing Defendant, but in liberally construing their *pro se* Complaint, the Court will presume that Plaintiffs intended to bring claims under § 1681s-2 of the FCRA, which imposes duties on "furnishers of information to consumer reporting agencies," such as Defendant. *See* 15 U.S.C. § 1681s-2. Subsection 1681s-2(a) does not provide a private cause of action. *See Beattie v. Nations Credit Fin. Servs. Corp.*, 69 F. App'x 585, 589 (4th Cir. 2003) (citing 15 U.S.C. § 1681s-2(d)) (explaining that § 1681s-2(a) "may be enforced only by federal and state agencies and officials"). By contrast, private individuals may sue furnishers of information, such as "credit card issuers, auto dealers, department and grocery stores, *lenders*, utilities, insurers, collection agencies, and government agencies," under § 1681s-2(b), which "outlines the duties a furnisher of information has when given notice of a dispute concerning inaccurately reported information." *Ausar-El v. Barclay Bank*

*Del.*, Civ. No. PJM-12-0082, 2012 WL 3137151, at *3 (D. Md. July 31, 2012) (emphasis added) (internal citations and quotation marks omitted).

In order to bring a claim under § 1681s-2(b), a plaintiff "must show that the undisputed facts establish (1) that she notified a CRA of the disputed information, (2) that the CRA notified the Defendant furnisher of the dispute, and (3) that the furnisher then failed to reasonably investigate and modify the inaccurate information." *Long v. Pendrick Cap. Partners II, LLC*, 374 F. Supp. 3d 515, 527 (D. Md. 2019) (citing *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430–31 (4th Cir. 2004)). A plaintiff can make these showings by providing evidence of dispute letters sent to a credit reporting agency, as well as dispute notices sent from a credit reporting agency to a furnisher of information. *Id.*

Plaintiffs allege that Defendant violated the FCRA by permitting Plaintiffs to skip loan payments while reporting those as missed payments to credit reporting agencies, which resulted in an "unknown" amount of damages to Plaintiffs. (Compl. ¶¶ 97–98.) Defendant seeks dismissal of Plaintiffs' FCRA claims because, *inter alia*, "Plaintiffs do not allege that they disputed the November 2019 reporting with a CRA[.]" (Mot. Dismiss Mem. Supp. at 13.) In response, Plaintiffs state that they "did not discover this information" regarding their credit reports "until months later during the pandemic and Plaintiffs were not able to do anything about it." (Opp'n Mot. Dismiss at 6.) While the pandemic posed myriad difficulties for individuals and small businesses alike, being unable "to do anything" about Plaintiffs' discovery of an alleged misrepresentation on their credit reports is not a legally valid excuse for not complying with the FCRA's requirements. Moreover, it is unclear why the pandemic would have prevented Plaintiffs from sending a notice to a credit reporting agency, either online or by mail, informing the agency of Defendant's alleged misrepresentation.

Accordingly, the Motion to Dismiss is granted with respect to the FCRA claims in Counts XVI and XVII of the Complaint.

### D. *State Law Claims – Remaining Counts*

Plaintiffs also bring various claims under Maryland tort law, alleging predatory lending (Counts I, II, III, and IV); breach of contract (Counts V, VI, VII, XII, XIII, XIV, and XV); fraud (Counts IX, X, XI, XII, XIII, XIV, and XV); and injury of credit (Counts XII, XIII, XVI, XVII, and XIX).[2] Defendant moves to dismiss all of Plaintiffs' state law claims. (*See* ECF No. 2.)

The federal supplemental jurisdiction statute provides that "district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A federal court "may decline to exercise supplemental jurisdiction" over state law claims where it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). Indeed, a court generally should not retain supplemental jurisdiction "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 357 (1988). In such cases, federal courts tend to exercise their "inherent power to remand removed State claims when the federal claims drop out of the case." *Hinson v. Norwest Fin. S.C., Inc.*, 239 F.3d 611, 616 (4th Cir. 2001).

Here, this Court has dismissed Plaintiffs' federal claims for failure to state a claim upon which relief can be granted, and accordingly, the Court no longer has original jurisdiction under

---

[2] Plaintiffs also reference "Gov. Larry Hogan's executive order" as a possible avenue for relief, and bring a claim for "failure to grant loan based on false information on credit report" (Count VIII). (Compl. at 1, 12.) These claims appear to arise under state law, but the legal theory underlying these claims is not clear. Despite construing Plaintiffs' *pro se* Complaint liberally, the Court cannot discern any cognizable legal cause of action with respect to these claims. *See White*, 886 F.2d at 722–23.

28 U.S.C. § 1331.[3]  As such, this Court will remand the remaining state law claims in the Complaint to the Circuit Court for Allegany County.

### IV. Conclusion

For the foregoing reasons, an Order shall enter (1) granting in part and denying in part Defendant's Motion to Dismiss (ECF No. 2); and (2) remanding the remaining state law claims to the Circuit Court for Allegany County.

DATED this 12 day of August, 2021.

BY THE COURT:

James K. Bredar
Chief Judge

---

[3] Defendant removed this case to federal court based on federal question jurisdiction (see Not. Removal, ECF No. 1), and neither party has shown that the Court has diversity jurisdiction over this case. See 28 U.S.C. § 1332(a)(1) (providing that district courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states" ); Cent. W. Va. Energy Co. v. Mountain State Carbon, LLC, 636 F.3d 101, 103 (4th Cir. 2011) (citing Caterpillar, Inc. v. Lewis, 519 U.S. 61, 68 (1996)) (explaining that diversity jurisdiction generally "requires complete diversity among the parties, meaning that the citizenship of every plaintiff must be different from the citizenship of every defendant").  On the contrary, the Complaint includes Maryland addresses for both Plaintiffs and Defendant, which suggests that this Court does not have diversity jurisdiction over the instant case. (See Compl. at 1.)